UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

LOUIS EDWARD HILL,                    )
                                      )
        Plaintiff,                    )
                                      )
v.                                    )        No.:   3:21-CV-31-TAV-DCP
                                      )
CENTURY ARMS, INC., and               )
CENTURY INTERNATIONAL ARMS,           )
INC.,                                 )
                                      )
        Defendants.                   )

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on defendants' motion for summary judgment [Doc. 65]. Plaintiff has responded [Doc. 75], and defendants have replied [Doc. 81]. For the reasons that follow, defendants' motion for summary judgment [Doc. 65] will be **GRANTED in part, DEFERRED in part,** and **DENIED in part**.

## I.      Background

In this case, plaintiff raises claims of negligence, strict liability for a manufacturing defect, strict liability for a design defect, strict liability for failure to warn, and negligent failure to warn, all relating to an alleged drop-fire shooting incident [Doc. 18, pp. 11–26].

### A.      Canik TP9 SF Elite II

On November 28, 2017, plaintiff purchased a new Canik TP9 SF Elite II pistol ("Canik pistol" or "subject pistol") at Big Daddy's Gun Store, in Loudon County, Tennessee [Doc. 65-4, pp. 31, 33, 35–36; Doc. 75, p. 9; Doc. 75-5, pp. 4–5].

The trigger system of this pistol is equipped with two passive safety systems: a trigger safety and a striker block/firing pin block safety [Doc. 65-6, pp. 2–3]. The primary function of these passive safety systems is to prevent the pistol from discharging when it is dropped or impacted [*Id*. at 3].

The Canik pistol was manufactured by Samsun Yurt Sanayi in Turkey and imported into the United States by Century Arms, Inc. ("Century Arms") [*Id.* at 2; Doc. 65-7, p. 4]. Thereafter, the Canik pistol was transferred to Century International Arms, Inc. and distributed to federally licensed distributors and firearm retailers [Doc. 65-7, p. 4]. Once the pistols are imported by Century Arms, they undergo quality and function testing [*Id*. at 6].

The Canik pistol was sold to plaintiff with a copy of the Owner's Manual [Doc. 65-2, p. 8; Doc. 65-3, pp. 7, 9; Doc. 75-4, p. 13]. However, plaintiff never reviewed the manual before using the pistol [Doc. 65-4, pp. 87–88; Doc. 75-3, p. 23].

The Owner's Manual for the Canik pistol warns users to "READ ALL INSTRUCTIONS AND WARNINGS IN THIS BOOKLET BEFORE USING THIS FIREARM" [Doc. 65-5, p. 5]. It states:

> A gun is only as safe as the person operating it. You can never be overly careful when handling a firearm. Carelessness is often the cause of shooting accidents . . . errors in gun handling can result in the loss of life, severe injury or property damage thus, it is crucial for your safety and the safety of those around you that you learn the principles of safe gun handling and storage before you begin to use your new firearm.

[*Id*. at 6]. The manual then sets forth "The Ten Commandments of Firearm Safety," the second of which is "Firearms Should Be Unloaded When Not Actually in Use" [*Id*. at 7].

2

This "commandment" states to "[n]ever carry a loaded gun in . . . a holster not being worn" [*Id*.]. The third "commandment" states "Don't Completely Rely on Your Gun's Safety" and specifically instructs to "**[t]reat every gun as through it could fire at any time, even if you are not applying pressure to the trigger**" [*Id*. at 8 (emphasis in original)].

Despite these warnings, it was plaintiff's practice to keep the Canik pistol loaded at all times [Doc. 65-4, pp. 43, 51; Doc. 75-3, pp. 12, 14]. He also kept the pistol in the holster, and did not, as a general practice, carry the holster on his hip [Doc. 65-4, p. 50; Doc. 75-3, p. 13].

## B. Shooting Incident

On the morning of February 25, 2019, plaintiff was preparing to go to work [Doc. 65-4, p. 45]. As a general practice, he took the Canik pistol with him to work every day [*Id*.; Doc. 75-3, p. 12]. Before he walked out the door, he would retrieve the pistol from the top of the dresser, where it was stored [Doc. 65-4, pp. 45–46; Doc. 75-3, p. 13]. That morning, plaintiff started the car, because it was cold outside, and placed his lunch in a cooler in the car [Doc. 65-4, pp. 47, 49; Doc. 75-3, p. 13].

Approximately 15 minutes later, plaintiff left for work with his backpack, a Yeti cup containing coffee, and the Canik pistol [*Id*.]. Plaintiff carried his backpack with one strap hung over his left shoulder [Doc. 65-4, p. 52; Doc. 75-3, p. 14]. He carried the Yeti cup in his right hand and the pistol in his left hand [Doc. 65-4, p. 53; Doc. 75-3, p. 14]. When he got to the car, he placed his backpack in the back seat [Doc. 65-4, p. 55; Doc.

3

75-3, p. 15].  Specifically, he opened the rear door with one finger on his right hand, while still holding the Yeti cup in that hand [Doc. 65-4, p. 55; Doc. 75-3, p. 15].  He then turned his body and set the backpack down in the seat [Doc. 65-4, p. 56; Doc. 75-3, p. 15].  While he was trying to get the backpack off, he still had the pistol in his hand, and he got the backpack partially off [Doc. 65-4, p. 56; Doc. 75-3, p. 15].  He did not recall what part of the pistol he was holding at that time [Doc. 65-4, p. 56; Doc. 75-3, p. 16].

At some point, plaintiff lost control of the pistol.  The first moment plaintiff knew something occurred is when his "leg was on fire" [Doc. 65-4, p. 61; Doc. 75-3, p. 16].  At that point, plaintiff threw his coffee into the backseat, closed the door, and hopped to the door of the house [Doc. 65-4, pp. 62–63; Doc. 75-3, pp. 16–17].  He then laid on the steps and began banging on the door to wake his wife [Doc. 65-4, p. 63; Doc. 75-3, p. 17].  When his wife came out, plaintiff told her what happened, and she called 9-1-1 [Doc. 65-4, pp. 63–64; Doc. 75-3, p. 17].

Plaintiff did not recall the pistol "banging" into anything as he was placing the backpack in the vehicle and did not have any recollection of how he lost control of the pistol [Doc. 65-4, pp. 59–60; Doc. 75-3, p. 16].  He did not recall seeing the pistol leave his hand and did not know if the pistol was still in the holster or not when it left his hand [Doc. 65-4, p. 60; Doc. 75-3, p. 16].  Plaintiff did not attempt to catch the firearm once it left his hand as he was not aware it was leaving his hand [Doc. 65-4, p. 77; Doc. 75-3, p. 16].  He also acknowledged that he did not know what caused the pistol to fire and did not see when the pistol discharged [Doc. 65-4, pp. 60–61; Doc. 75-3, p. 16].

4

An incident report from the Loudon County Sheriff's Office, made by Deputy Craig Brewer, indicates that he responded to the scene [Doc. 65-8, pp. 1, 3]. Upon arrival, he found plaintiff in his carport sitting on the stairs with a gunshot wound through the left inner calf [*Id.* at 3]. Plaintiff informed Deputy Brewer that he was putting his "stuff" into his vehicle to go to work when the pistol fell to the ground and discharged [*Id.*]. The pistol was located under the vehicle near the rear tire [*Id.* at 4]. The report indicates that a Canik 9mm gun magazine and 16 live rounds were found, along with 1 spent casing still in the chamber [*Id.* at 3, 5].

Deputy Brewer testified that "[f]rom the statements that [he] got from the victim on the scene[,]" the weapon fell and discharged upon hitting the concrete [Doc. 75-11, pp. 2, 5]. He did not do any independent investigation into the incident, including to confirm whether the firearm had fallen to the ground and discharged [Doc. 65-10, pp. 8, 11; Doc. 75-11, p. 10]. Deputy Brewer stated that, other than plaintiff's statement, he had no information to confirm that the gun did fall and fire [Doc. 75-11, p. 11].

Deputy Christopher Bowen of the Loudon County Sheriff's Office testified that he investigated the shooting and concluded that it was an unintended shooting, particularly, a drop fire [Doc. 75-10, p. 2]. He stated that "[f]rom what [he] was told and what [he] saw on the scene" the pistol dropped from "some distance" and fell to the ground, at which point the weapon went off [*Id.* at 2]. Deputy Bowen did not see anything at the scene that contradicted plaintiff's version of events [*Id.* at 6]. However, he never investigated where the gun would have fallen and struck the concrete [Doc. 65-9, pp. 6–

5

7].  He did not attempt to re-create the incident, did not try to determine what caused the gun to fire, and did not investigate if the gun had dropped or if it fired when dropped [Doc. 65-9, p. 8; Doc. 75-10, p. 9].  Deputy Bowen stated that the purpose of his investigation was not to confirm whether or not there was a drop fire [Doc. 65-9, p. 12; Doc. 75-10, p. 10].

Detective Jerramie Bowen of the Loudon County Sheriff's Office, and brother of Deputy Bowen, stated that he also responded to the incident [Doc. 75-12, pp. 2, 6]. Plaintiff advised him that he was putting his stuff in the car to go to work, dropped the firearm, and the firearm went off [*Id*. at 2–3].  Detective Bowen did not do anything to confirm plaintiff's story about what occurred other than recovering the firearm from the rear driver's tire area of the vehicle, which he did not specifically recall doing, despite the reflection of this fact in reports [*Id*. at 7].  He did not investigate to confirm whether it was a dropped firearm incident or some other type of firearm discharge [*Id*. at 9].

Plaintiff testified that, after the incident, no one at the Sheriff's Department ever discussed the incident with him [Doc. 65-4, pp. 26, 65; Doc. 75-3, pp. 7, 17].

### C.    Safety Warning and Severe Duty Upgrade

On September 1, 2017, Century Arms issued a "Safety Warning and Severe Duty Upgrade Notice" ("Severe Duty Upgrade notice") that applied to the TP9SF Elite model Canik pistols [Doc. 75-2, p. 1].  The Severe Duty Upgrade notice specifically included the serial number for the subject pistol [Doc. 75-6, p. 4].  This warning stated that "[e]valuations and tests have shown that **repeated abusive dropping of pistols may**

6

**result in damage to safety features and unintentional discharge**" [Doc. 75-2, p. 1 (emphasis in original)]. However, it indicated that "[t]here are no safety concerns with the pistols when used under ordinary conditions" [*Id*.]. The warning stated that Century Arms was "offering a *voluntary* upgrade to the trigger safety spring and firing pin block spring" on the relevant Canik models "to further increase the safety of Canik pistols for enhanced drop discharge prevention in heavy/severe duty conditions that are *beyond* industry standards" [*Id*. (emphasis in original)].

Plaintiff first became aware of the severe duty upgrade when someone told him about it after the February 2019 incident [Doc. 75-3, p. 20]. The severe duty upgrade was issued only three months before the purchase of his pistol [Doc. 65-11, p. 6]. Plaintiff had never dropped the pistol or had any problems with it prior to February 2019 [Doc. 75-3, p. 20].

### D.    Post-Incident Testing

#### 1.    Defendants' Expert Witness: Derek Watkins

Derek Watkins stated that he and Charles Powell examined the subject pistol on three occasions [Doc. 65-6, p. 5]. During the first examination, a CT scan showed the pistol contained no broken or overtly altered components [*Id*.]. The trigger safety was verified to be functioning properly and fully engaging the pistol's frame to prevent trigger movement [*Id*.]. The CT scan further showed that the striker block safety was functioning properly [*Id*.].

7

The second exam of the subject pistol consisted of the physical function testing and a field strip of the firearm [*Id*. at 7]. The pistol passed all of the function tests [*Id*.]. The passive safety tests were video recorded and were proven to be working properly [*Id*. at 8]. No signs of damage, wear, or atypical performance consistent with the severe duty upgrade program were observed [*Id*.]. The external examination showed overt damage in only two locations: the rear sight and the bottom of the grip [*Id*. at 9]. The only "extensive damage" was to the rear sight, which had been sheared in half, with the front half remaining on the pistol's slide and the rear half having broken free [*Id*. at 10]. Watkins opined that the damage being localized to the sight "is more consistent with the sight being slammed into the concrete, but the pistol remaining relatively immobile. The damage is very atypical" [*Id*.]. Watkins did note that an inspection of the internal components of the subject pistol revealed that the hook of the trigger bar spring was slightly out of position and a small dent was present on the top of the sear, but these conditions were present during the CT scan and had no effect on the functionality of the pistol [*Id*. at 11].

During a third inspection, the focus was on Powell's test pistols [*Id*. at 12]. Watkins opined that Powell's drop test pistol "was very beat up and looked nothing like the subject pistol" and "[d]espite all the damage Mr. Powell had inflicted on his test pistol, he had failed to break off the rear sight and had failed to cause the pistol to discharge absent a trigger pull" [*Id*.]. Watkins stated that an "inadvertent trigger pull

8

accounts for all of the observed physical evidence. Mr. Powell's drop testing accounts for none of [sic] physical evidence" [*Id*. at 14].

Watkins ultimately opined that the subject pistol discharged at the time of the incident because the trigger and its trigger safety were pulled or otherwise depressed [*Id*. at 18]. He states that the subject pistol and its fire control components do not possess any manufacturing or design defects which are causally related to the discharge of the pistol, and no design or manufacturing defects exist in the subject pistol that would cause the pistol to discharge absent a trigger pull [*Id*.]. Watkins also opined that the discharge of the subject pistol was a result of plaintiff's failure to follow safe gun handling practices [*Id*. at 19].

### 2. Plaintiff's Expert Witness: Charles Powell

In his report, Powell indicated that he was conducting a technical examination and failure analysis of the subject pistol, which was submitted with a fractured rear sight [Doc. 65-11, p. 2]. Powell stated that he purchased two exemplar Canik pistols for examination and testing [*Id*. at 6]. Exemplar 1 ("EX1") was a Canik Model TP9SF that was subject to the voluntary severe duty upgrade offer, and Exemplar 2 ("EX2") was a Canik Model TP9SF Elite that was manufactured after the start of the severe duty upgrade and, therefore, had the upgraded components [*Id*.]. According to Powell, EX2 is an identical model to the subject pistol [*Id*.]. Powell noted five differences between the components in EX1 and EX2, and stated that, based on photographs and CT scans, the subject pistol's internal components matched that of the EX1 pistol [*Id*.].

9

As part of his drop testing, Powell made a change to the notch of the trigger safety "[b]ecause in the exemplars their notch is different than that in the subject pistol so measurements were made from the CT scan and that trigger safety component altered to match those in the subject pistol" [Doc. 65-13, p. 21]. Additionally, Powell removed components from EX1 and installed them into EX2 for purposes of testing [*Id*. at 23, 117]. According to Powell, this made the EX2 pistol "the same as the subject pistol" [*Id*. at 117]. Powell explained that these alterations were necessary because he could not find a pistol that was the same as the subject pistol after looking on auction websites, used pistol websites, and at local vendors [*Id*. at 23].

Powell stated that, when drop tested "per 2007 TOP-3-2-045, Test Operations for Small Arms, that requires a drop from 60" onto a concrete surface,"[1] the test pistol's trigger safety did not function, and the trigger was inertially pulled to the far rear of the trigger guard [Doc. 65-11, p. 6]. The test pistol did not discharge during testing, but Powell opined that "the negation of the only safety system on the pistol, the striker block safety, shows its capability to discharge upon a drop incident like the subject pistol did when Mr. Hill was severely injured" [*Id*.; Doc. 65-13, pp. 49–50]. Powell thus opined that "[p]re-Safety Warning Canik pistol models, like Mr. Hill's Subject pistol, are defective in design or manufacture for using components that allow the trigger safety to malfunction and allow the trigger to be moved inertially to the rear and unintentionally

---

[1] Powell stated that 60 inches was the highest standard height for a drop test he was aware of [Doc. 65-13, p. 110]. Powell did not test any of the pistols with a drop from what would be plaintiff's pocket height [*Id*. at 118].

10

discharge the Canik pistol from a drop" [Doc. 65-11, pp. 6–7]. Powell stated that, in his testing, the trigger "moved a significant amount," and while the trigger safety "did not stop the trigger[,]" the pistol did not discharge during the testing [Doc. 65-13, pp. 112–13].

Powell explained that the fractured rear sight represented the impact contact point of the subject pistol when it was dropped and discharged [Doc. 65-11, p. 7].

Powell stated that his report and work shows that the defect in the trigger safety is directly responsible for the drop fire that injured plaintiff [Doc. 65-13, p. 35]. Specifically, he stated that his testing showed that the only safety on the pistol was compromised by the design defect, so that the lack of a safety when it dropped was directly responsible for the discharge of the pistol and the injury to plaintiff [*Id*. at 36].

## II.    Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party.  *McLean v. 988011 Ontario Ltd*., 224 F.3d 797, 800 (6th Cir. 2000).  As such, the moving party has the burden of conclusively showing the lack of any genuine issue of material fact.  *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979).  To successfully oppose a motion for summary judgment, "[t]he non-moving party . . . must present sufficient evidence from which a jury could reasonably find for him." *Jones v.*

11

*Muskegon Cnty.*, 625 F.3d 935, 940 (6th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 252 (1986)).

## III. Analysis

The Tennessee Products Liability Act ("TPLA") sets forth the statutory framework for bringing a products liability claim against a manufacturer or seller and "superseded common law claims for personal injuries stemming from alleged defects in products or failures to warn of the dangers associated with a product." *Coffman v. Armstrong, Int'l Inc.*, 615 S.W.3d 888, 895 (Tenn. 2021). Thus, plaintiff's claims for negligence, strict liability, and failure to warn are governed by the TPLA. *See Merrell v. Summit Treestands*, *L.L.C.*, 680 F. Supp. 3d 907, 915 (E.D. Tenn. 2023).

"To establish a prima facie products-liability claim, a 'plaintiff must show: (1) the product was defective and/or unreasonably dangerous, (2) the defect existed at the time the product left the manufacturer's control, and (3) the plaintiff's injury was proximately caused by the defective product.'" *Id.* (quoting *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 482 (6th Cir. 2008)). This same three-pronged prima facie case applies in all TPLA cases, regardless of what theory of liability a party proceeds under—e.g. strict liability, negligence, breach of warranties, or failure to warn. *Hill v. Kia Motors, Inc.*, Nos. 20-5690, 20-5693, 2022 WL 557923, at *7 (6th Cir. Feb. 24, 2022).

### A. Failure to Warn

First, defendants argue that plaintiff's claims based on a failure to warn should be dismissed at summary judgment [Doc. 65-1, p. 13]. Plaintiff responds that he does not

object to dismissal of his failure to warn claims [Doc. 75, p. 22]. Based on plaintiff's abandonment of those claims, defendants' motion for summary judgment will be **GRANTED** as to plaintiff's claims premised on a failure to warn, and those claims will be **DISMISSED**.

### B. Manufacturing and/or Design Defect

#### 1. Manufacturing Defect Theory

Defendants contend that plaintiff lacks evidence to proceed on a claim of a manufacturing, as opposed to a design, defect [Doc. 65-1, pp. 12–13]. Plaintiff does not directly respond to this argument, but rather, does not distinguish whether the alleged defect is a "design" defect or a "manufacturing" defect in his argument [*See* Doc. 75].

As an initial matter, defendants appear to claim that Powell admitted that there was no manufacturing defect, only a design, defect, in his deposition [Doc. 65-1, pp. 12–13]. In support, defendants point to Lines 1 to 7 on Page 24 of Powell's deposition testimony in which he states:

> Q: And are your opinions critical of the design of the pistol, the manufacture of the pistol, or something else?
>
> A: The defects I observed were design defects. I don't have the drawings as I stated in my report so all I can do is surmise that they intended to make the parts in this way.

[Doc. 65-13, p. 25]. But this cited portion of Powell's testimony cuts Powell's answer to the question off midway. Lines 8 to 24 proceed as follows:

> Should I get the – should I get the design drawings from the pistol and I find that the part dimensions or materials are different than those in the drawings, then I – it could be a manufacturing defect.

13

Q:       So are you saying right now that you don't know?  You're not sure?
What? I just want to know the parameter that we're dealing with.

MR. WHEELES: Object to form.

A:       Well, as I've stated in my report, I believe that the defect present in
Mr. Hill's pistol was a design defect, but as I mentioned in the report, I
have not reviewed any engineering drawings from this pistol, and when
they're produced I may compare them to those components and Mr. Hill's
pistol, and if they're mismanufactured, then it may also be a manufacturing
defect.  I just have no way of judging that at this time.

[*Id.*].  Read in full, the Court will not take Powell's testimony as disclaiming the
existence of a manufacturing defect in this case.

Moreover, defendants' argument in this regard seems to suggest that plaintiff must
be able to establish the source of the alleged defect in the pistol—that is, whether the
source resulted from the pistol's design or from an error in the manufacturing.  But none
of the elements of a prima facie claim under the TPLA requires a showing of the source
of the alleged defect, and defendants have cited no case law in support of this contention.
And, as the Sixth Circuit has noted, "issues adverted to in a perfunctory manner,
unaccompanied by some effort at developed argumentation, are deemed waived. It is not
sufficient for a party to mention a possible argument in the most skeletal way, leaving the
court . . . to put flesh on its bones."  *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir.
1997) (internal quotation marks and alterations omitted).  Defendants' total argument on
this point is as follows: "Plaintiff has presented no evidence to support a claim of
manufacturing defect, as his expert acknowledges.  As such, summary judgment is
warranted as to Plaintiff's claim of manufacturing defect" [Doc. 65-1, pp. 12–13 (internal

14

citations omitted)].  The Court declines to "put flesh on [the] bones" of this skeletal argument, and defendants' motion for summary judgment as to plaintiff's manufacturing defect theory is **DENIED** on this ground.

## 2. Expert Testimony

Next, defendants argue that, under Tennessee law, expert testimony is necessary to establish liability for manufacturing and/or design defects [Doc. 65-1, p. 10].  In support, defendants quote *Bradley v. Ameristep*, 800 F.3d 205, 210 (6th Cir. 2015) as stating "under Tennessee law, expert testimony is required to establish liability in cases alleging manufacturing and design defect" [*Id.*].

Plaintiff replies that defendants' argument is an incorrect statement of law [Doc. 75, p. 13].  Plaintiff contends that, while he has admissible expert testimony under *Daubert*, he is not required to have such [*Id.* at 18].

The quotation defendants rely on is, in actuality, a quotation within the *Bradley* opinion from the Sixth Circuit's prior decision in *Pride v. BIC Corporation*, 218 F.3d 566, 580–81(6th Cir. 2000).  *Bradley*, 800 F.3d at 209–10 (quoting *Pride*, 218 F.3d at 580–81).  But *Bradley* specifically addressed whether this quotation from *Pride* was a correct statement of Tennessee law.  *Id.* at 210 ("Setting aside the fact that this statement is arguably dicta and therefore not binding precedent, it is not clear that this is an accurate statement of Tennessee law.").  The *Bradley* Court ultimately determined that expert testimony was not necessary to proceed on a claim of manufacturing/design defect under the consumer expectations test because, requiring such would "strip the jury of the ability

15

to use its own judgment about ordinary expectations and thereby effectively nullify the consumer expectations test in its entirety." *Id.* at 211. As discussed in more detail *infra*, plaintiff has limited his theory of defect to the consumer expectations test. Accordingly, no expert testimony is required. And, even if expert testimony was required, the Court has denied defendants' *Daubert* motion, and plaintiff has expert testimony to support his claim. Thus, to the extent defendants seek summary judgment on this ground, their motion is **DENIED**.

### 3. Defective and/or Unreasonably Dangerous

Turning to the first prong of the prima facie requirements under the TPLA, "defective conditions" and "unreasonably dangerous conditions" are alternatives, and a plaintiff may rely on either or both. *Merrell*, 680 F.3d at 915. "[A] plaintiff may demonstrate that a product was defective or unreasonably dangerous through direct evidence, circumstantial evidence, or a combination." *Sigler*, 532 F.3d at 483; *see also Browder v. Pettigrew*, 541 S.W.2d 402, 405 (Tenn. 1976). Moreover, "[t]he general rule in Tennessee is that the issue of whether a product is defective or unreasonably dangerous is one for the jury." *Curtis ex rel. Curtis v. Universal Match Corp., Inc.*, 778 F. Supp. 1421, 1427 (E.D. Tenn. 1991) (citing *Jackson v. Tenn. Valley Auth.*, 415 F. Supp. 1050, 1058 (M.D. Tenn. 1976)).

### a. Unreasonably Dangerous

A product is "unreasonably dangerous" under the TPLA if it is:

dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common

16

to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller knew of its dangerous condition.

Tenn. Code Ann. § 29-28-102(8). "Tennessee law provides two tests for determining whether a product is unreasonably dangerous" — the "consumer expectation test" and the "prudent manufacturer test." *Sigler*, 532 F.3d at 483–84.

In their summary judgment motion, defendants only address whether there is sufficient evidence under the prudent manufacturer test [Doc. 65, p. 9]. But in response, plaintiff limited his claim that the firearm was "unreasonably dangerous" to the consumer expectation test [Doc. 75, p. 11]. Plaintiff has therefore abandoned any claim that the pistol was unreasonably dangerous under the prudent manufacturer test, *see Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment"), and the Court will thus limit its analysis to the consumer expectations test.

In their reply brief, defendants contest whether the consumer expectations test is appropriately applied in this case, as it involves a complex product beyond the knowledge of ordinary consumers [Doc. 81, pp. 11–12].

"The consumer expectation test assesses 'whether the product's condition poses a danger beyond that expected by an ordinary consumer with reasonable knowledge.'" *Tatham v. Bridgestone Ams. Holding, Inc.*, 473 S.W.3d 734, 750 (Tenn. 2015) (quoting *Ray ex rel. Holman v. BIC Corp.*, 925 S.W.2d 527, 529 (Tenn. 1996)). Under the

17

consumer expectation test, "a product is not unreasonably dangerous if the ordinary consumer would appreciate the condition of the product and the risk of injury." *Ray ex rel. Holman*, 925 S.W.2d at 530. Under this test "[t]he manufacturer or seller's conduct, knowledge, or intention is irrelevant. What is determinative is what an ordinary consumer would have expected." *Id.* at 531. "Obviously, this test can only be applied to products about which an ordinary consumer would have knowledge." *Id.* "By definition, [the consumer expectation test] could be applied only to those products in which *everyday experience* of the products' users permits a conclusion." *Id.* (internal quotation marks omitted) (emphasis in original). "For example, ordinary consumers would have a basis for expectations about the safety of a can opener or coffee pot, but perhaps not about the safety of a fuel-injection engine or an air bag." *Id.*

Thus, Tennessee courts have recognized that a party may not proceed under the consumer expectation test to "establish[] the unreasonable dangerousness of a complex product about which an ordinary consumer has no reasonable expectation." *Brown v. Raymond, Corp.*, 432 F.3d 640, 644 (6th Cir. 2005) (internal quotation marks omitted). Nonetheless, "the consumer expectations test is applicable to technically complex consumer products that are familiar to consumers." *Coffey* v. *Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 972 (M.D. Tenn. 2002) (citing *Jackson v. Gen. Motors Corp.*, 60 S.W.3d 800, 805 (Tenn. 2001)). The Western District of Tennessee summarized case law on this matter as follows:

> Courts interpreting Tennessee law have concluded that application of the consumer expectation test is appropriate in cases involving

18

seatbelts, *Jackson*, 60 S.W.3d at 804-05 ("[a] seat belt is a familiar product whose basic function is well understood by the general population"); **tires**, *Tatham*, 473 S.W.3d at 751 (a tire is not "complex" for purposes of applying the consumer expectation test, despite the complexity of the manufacturing process, because the "general driving populace understands the basic function and purpose of a tire"); **airbags**, *Sigler*, 532 F.3d at 485-86 (an airbag is a familiar product and consumers and manufacturers expected it to deploy in the type of high speed frontal crash alleged by plaintiff); and **ATVs**, *Whirley v. Kawasaki Motors Corp., USA*, No. 1:04cv1145 T/An, 2007 WL 9706819, at **8-9 (W.D. Tenn. Feb. 21, 2007) (the consumer popularity of ATVs, along with their relatively simple design involving four wheels, suspension, disc brakes, and a wide wheel base, provide sufficient familiarity to give the ordinary consumer a reasonable expectation about ATV safety), but **not complex tools**, *Coffey v. Dowley Mfg., Inc.*, 89 F. App'x 927, 929-30 (6th Cir. 2003) (a novel automotive repair tool so complicated it was unlikely even the average auto mechanic would have a reasonable expectation of its safety without training should not be evaluated under the consumer expectation test); **car radiators**, *Simpson v. O'Reilly Auto. Stores, Inc.*, No. 2:13-cv-2684-SHLcgc, 2014 WL 11514969, at *6 (W.D. Tenn. Dec. 30, 2014) (consumer expectation test inapplicable because, despite their commonness, "ordinary consumers do not have the sort of familiarity with radiators that would engender expectations as to how they would perform"); **medical bronchoscopes**, *Young v. Olympus Am., Inc.*, No. 07-2547-STA, 2012 WL 252645, at **5-6 (W.D. Tenn. Jan. 26, 2012) (consumer expectation test inapplicable because the ordinary consumer, lacking knowledge that proper practice protocols for bronchoscope at issue required cleaning and flushing with disinfectant between patients to prevent spread of infection, would not have minimum safety expectations with respect to the product); **metal restraint rods on a sophisticated amusement park ride**, *Alexander v. Zamperla*, No. E2009-01049-COA-R3-CV, 2010 WL 3385141, at **2, 7 (Tenn. Ct. App. Aug. 27, 2010) (finding prudent manufacturer test more appropriate); **industrial forklifts**, *Brown v. Raymond Corp.*, 432 F.3d 640, 642, 644-45 (6th Cir. 2005) (in products liability suit involving the wheel well of a co-worker's industrial forklift's entry into the operator compartment of plaintiff's forklift, the prudent manufacturer test was "precisely the type of 'situation' in which the 'ordinary consumer' would not have 'an expectation regarding the safety of the product' "); and **boom truck cranes**, *Johnson v. Manitowoc Boom Trucks, Inc.*, 406 F. Supp. 2d 852, 857-58 (M.D. Tenn. 2005) (the prudent manufacturer test applied, as "the appropriate design of a boom truck crane

19

and the safety features of such a crane are not within the 'common knowledge of laymen'").

*Kines v. Ford Motor Co.*, 558 F. Supp. 3d 614, 628–29 (W.D. Tenn. 2021) (emphasis added). In that case, the Western District determined that the bracket on a folding seat was more akin to seat belts and tires, and therefore, the consumer expectations test applied. *Id.* at 629–30.

The Court thus must determine whether a pistol and its trigger safety system are the type of product that the ordinary consumer would be familiar enough with to have a reasonable expectation of its relative safety, such that plaintiff could proceed under the consumer expectations test. There is no doubt that that the trigger safety system itself is "complex." *See Mayes v. Sig Sauer, Inc.*, No. 1:19-cv-146, 2023 WL 2730264, at *9 (W.D. Ky. Mar. 30, 2023) ("[t]he inner workings and mechanics of the [firearm] are not 'matters of general knowledge,' but instead involve a complex and technical understanding of firearms, engineering, and physics"). But complexity alone is not determinative. *See Coffey*, 187 F. Supp. 2d at 972. While, perhaps a close call, the Court determines that the ordinary consumer of firearms is sufficiently familiar with such product and its trigger safety system to have a reasonable expectation regarding the safety of the product. Within the spectrum of products discussed by the *Kines* court, the Court finds that a pistol is most comparable to air bags and ATVs in terms of consumer familiarity with the safety of such products, and Tennessee courts have found that both of those products may be evaluated under the consumer expectation test. *Kines*, 558 F. Supp. 3d at 628–29 (citing *Sigler*, 532 F.3d at 485–86 (airbags) and *Whirley*, 2007 WL

20

9706819, at *8–9 (ATVs)). Accordingly, the Court finds that plaintiff may proceed under the consumer expectations test in this case.

The Court next turns to whether plaintiff has established a genuine issue of material fact under the consumer expectations test. Plaintiff points to testimony of several individuals familiar with firearms regarding whether they would expect a firearm to discharge when dropped, which plaintiff contends shows that the "ordinary knowledge common to the community" is that a pistol should not fire when dropped [Doc. 75, pp. 16–17]. Defendants reply that plaintiff has presented no evidence that the subject pistol will fire when dropped, and thus, even if a pistol that drop fires could be contrary to consumer expectations, there is no evidence that this expectation was violated here [Doc. 81, p. 11]. Moreover, defendants argue that the manual for the subject pistol provides the best indication of what consumers should expect from its use, which includes detailed warnings, including the possibility for any firearm to discharge when dropped [*Id.*].

The consumer expectations test requires a plaintiff to produce evidence that "the prolonged use, knowledge, or familiarity of the products' performance by consumer[s] is sufficient to allow consumers to form reasonable expectations of the product's safety." *Coffey*, 187 F. Supp. 2d at 968. Under this test "summary judgment is proper if the undisputed evidence demonstrates that 'the danger is obvious to the ordinary consumer.'" *Id.* (quoting *Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1427 (E.D. Tenn. 1991)). Whether a plaintiff will be successful under the consumer expectations test depends on whether the *trier of fact* agrees that the plaintiff's expectation of the product's

21

performance constituted the "reasonable expectation of the ordinary consumer" having knowledge of the product's characteristics. *Kines*, 558 F. Supp. 3d at 630. Because the test requires a jury to "employ its own sense of whether the product meets ordinary expectations," expert testimony is not required. *Bradley*, 800 F.3d at 210−11 (quoting *Jackson*, 60 S.W.3d at 805−06).

The Court finds that sufficient evidence warrants submitting the question of whether a defect existed under the consumer expectations test to the jury. The Court first notes, again, that "[t]he general rule in Tennessee is that the issue of whether a product is defective or unreasonably dangerous is one for the jury." *Curtis ex rel. Curtis*, 778 F. Supp. at 1427. Plaintiff has submitted evidence that numerous individuals, including several police officers and owners of a gun shop, all expected that a firearm would not discharge when dropped [*See* Doc. 75-4, p. 23; Doc. 75-5, p. 13; Doc. 75-10, p. 3; Doc. 75-11, p. 4; Doc. 75-12, pp. 3–4]. But defendants have also presented evidence that calls into question whether that expectation is reasonable—namely, the numerous warnings in the subject pistol's manual, including warnings specifically advising that the firearm should be treated as if it could fire if dropped [*See* Doc. 65-5, p. 8]. And this evidence does not rise to the level of establishing that the "danger is obvious to the ordinary consumer," *see Coffey*, 187 F. Supp. 2d at 968, particularly given the evidence that several individuals familiar with firearms would not expect this danger from a firearm. Rather, the evidence before the Court raises a genuine issue of material fact as to whether the subject pistol was "dangerous to an extent beyond that which would be contemplated

22

by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *See* Tenn. Code Ann. § 29-28-102(8). Accordingly, summary judgment is **DENIED** on this ground.

### b. Defective Condition

Under the TPLA, a product in a "[d]efective condition" means "a condition of a product that renders it unsafe for normal or anticipatable handling and consumption." Tenn. Code Ann. § 29-28-102(2). To establish a defective condition, a plaintiff must identify a "specific error in construction or design of the [product]." *Fulton*, 872 S.W.2d at 912 (quoting *Browder*, 541 S.W.2d at 404). "[F]actors to consider in assessing a product's defectiveness include technology, knowledge, customary designs, etc., of similar products at the time of manufacture" as well as "consumer knowledge about the risks inherent in the use of a product[.]" *Silver v. Nat'l Presto Indus., Inc.*, 884 F.2d 1393, 1989 WL 106290 (Table), at *4 (6th Cir. Sept. 15, 1989) (citations omitted). "It is not required that [a product's] design be perfect, or render the product accident proof or incapable of causing injury." *Curtis ex rel. Curtis*, 778 F. Supp. at 1430.

Defendants argue that plaintiff has presented no evidence of a defect in the subject pistol [Doc. 65-1, p. 8]. Plaintiff states that there are two categories of evidence supporting his allegation of a defect: (1) evidence that the incident at issue here was a drop fire; and (2) evidence of a defective trigger safety [Doc. 75, p. 13].

Regarding the first category, plaintiff states that the existence of a drop-fire injury is supported by his own testimony, the testimony of deputies who investigated the

accident, and Powell's observation and measurements [*Id*. at 13–14]. As discussed in more detail *infra*, plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether the shooting incident was the result of a drop-fire. But there is evidence on both sides of that question, as there must be for a genuine issue of fact to exist. Thus, it remains an open question of fact whether the shooting incident was the result of a drop fire or if there was some other cause of the pistol's discharge. In light of this, it would amount to putting the cart before the horse to consider the existence of the incident as evidence that the pistol was defective. In other words, because it has yet to be determined what caused the pistol to discharge, the Court cannot say that the incident was caused by a defective condition of the pistol versus an accidental trigger pull.

Moreover "[a]s a general rule, an injury in and of itself is not proof of a defect and thereby does not raise any presumption of defectiveness. . . . Consequently, it is not enough to show that the product caused the plaintiff's injury or was involved in it." *Shoemake v. Omniquip Int'l, Inc.*, 152 S.W.3d 567, 573 (Tenn. Ct. App. 2003) (internal citations omitted). Instead, "the burden is upon the plaintiff to show that there is something wrong with the product." *Id.* (internal quotation marks and alterations omitted). Thus, the Court finds that evidence regarding the instant incident being the result of a drop fire cannot support plaintiff's allegation of a defective condition.

As the second category, plaintiff cites both Powell's testing and defendants' "Severe Duty Voluntary Upgrade Program" [Doc. 75, pp. 14–16]. Plaintiff contends that Powell's testing showed that the subject pistol trigger safety is defective, as, in every test

24

conducted by Powell, the trigger and trigger safety pulled fully rearward [*Id.* at 15]. Additionally, plaintiff contends that the Severe Duty Voluntary Upgrade program, issued two months before plaintiff's purchase of the subject pistol, indicated that the pistol carried the risk of a drop fire [*Id.* at 15–16].

Defendants argue that Powell's testing is not competent evidence, and argue that, because no discharge occurred during Powell's testing, he has not shown that the subject pistol is capable of firing from a drop, nor has Powell identified the basis of his claimed design flaw [Doc. 81, p. 9].[2]

Defendants' challenge to Powell's testing as evidence supporting a defect is unavailing at the summary judgment stage. The Court cannot weigh the evidence at summary judgment. *See Moran v. Al Basit, LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (noting that, at the summary judgment stage "credibility judgments and weighing of the evidence are prohibited" (quoting *Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010))). Moreover, defendants' arguments in this regard harken back to the parties' *Daubert* dispute regarding Powell's opinion evidence. And the Court denied defendants' *Daubert* motion, holding that the reliability of disputed evidence was a proper matter for cross examination and the jury's determination, rather than exclusion of evidence under *Daubert* [Docs. 101, 140]. The Court declines to revisit that holding in the context of this summary judgment motion.

---

[2] Defendants also stated that they were filing a motion to preclude Powell's testimony, which they argued, supported summary judgment [Doc. 65-1, pp. 10–11]. However, the magistrate judge has since denied that motion [Doc. 101], and this Court has affirmed that decision [Doc. 140].

25

Further, to the extent that defendants argue that Powell's testing cannot create a genuine issue of material fact regarding a defect because he was unable to recreate a drop fire in his testing, the Court notes that "[r]eproduction of an accident is not a requirement for an expert to opine on the cause of the accident; not every accident is susceptible to easy reproduction." *Stratton v. Thompson/Ctr. Arms, Inc.*, 601 F. Supp. 3d 1139, 1155 (D. Utah 2022). The Court does not find that the lack of recreation of a drop fire incident, standing alone, sufficiently negates the other evidence from Powell's testing, such that no genuine issue of material fact could exist as to the existence of a defective condition.

Turning to the evidence resulting from Powell's testing, in his report, Powell indicated that during his drop testing of the exemplar pistol "the trigger safety did not function and the trigger was initially pulled to the far rear of the trigger guard" [Doc. 75-6, p. 5]. Powell acknowledged that the exemplar pistol did not discharge during testing, but stated that "the negation of the only safety system on the pistol, the striker block safety, shows its capability to discharge upon a drop incident" [*Id.*]. Powell indicated that the subject pistol was "defective in design or manufacture for using components that allow the trigger safety to malfunction and allow the trigger to be moved inertially to the rear and unintentionally discharge the Canik pistol from a drop [*Id.* at 5–6]. Although Powell does not specify which "components" were defective in design or manufacture, he does provide comparative photographs of various components of the Canik model pistols as manufactured both before and after the Severe Duty Program [*Id.*

26

at 26–29].  And Powell opines that "[t]he post-Safety Warning Canik TP9SF Elite models appear to have the proper components to allow the trigger motion to be blocked when the pistol is dropped" [*Id.* at 6].  The Court finds that this evidence is sufficient to create a genuine issue of material fact as to whether there was a defective condition relating to the subject pistol's trigger safety's functioning.

As to the Severe Duty Voluntary Upgrade, defendants contend that this is irrelevant, as it relates solely to incidents of repeated abusive dropping which is not alleged in this case [Doc. 81, p. 10].  Moreover, defendants contend that the Severe Duty Voluntary Upgrade is a remedial measure that the Court may not consider under Rule 407 of the Federal Rules of Evidence [*Id.*].

Initially, the Court turns to defendants' contention that the Court may not consider the Severe Duty Upgrade notice under Rule 407.  Rule 407 of the Federal Rules of Evidence states:

> When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:
>
> - negligence;
> - culpable conduct;
> - a defect in a product or its design; or
> - a need for a warning or instruction.
>
> But the court may admit this evidence for another purpose, such as impeachment or – if disputed – proving ownership, control, or feasibility of precautionary measures.

Fed. R. Evid. 407.  However, the Sixth Circuit has held that Rule 407 is limited to "remedial measures taken *after* an event that would have made the event less likely to

27

occur." *In re Air Crash Disaster*, 86 F.3d 498, 531 (6th Cir. 1996) (emphasis added). Evidence of "measures taken *after* the design of a product but *before* the accident" do not fall within Rule 407's prohibition. *Id.* (emphasis in original). The Severe Duty Upgrade notice was issued on September 1, 2017 [Doc. 75-2, p. 1]. But the shooting incident here occurred more than a year later, on February 25, 2019 [Doc. 75-3, p. 12]. In fact, the Severe Duty Upgrade notice was issued three months before plaintiff even purchased the subject pistol [*See* Doc. 75-6, p. 5]. Accordingly, because it was issued prior the incident at issue, the Court finds that the Severe Duty Upgrade notice is not precluded by Rule 407.

Turning to the impact of that evidence, while not directly applicable to this situation by its own terms [*see* Doc. 75-2, p. 1 (stating that "[e]valuations and tests have shown that **repeated abusive dropping of pistols may result in damage to safety features and unintentional discharge**." (emphasis in original))], the Court does find that the Severe Duty Upgrade notice, combined with the evidence from Powell's testing, create a genuine issue of material fact as to whether a defect existed in the trigger safety system of the subject pistol. Although there is no evidence of "repeated abusive dropping" of the subject pistol, the Severe Duty Upgrade notice nonetheless provides some evidence that, at least under some conditions, the subject pistol was capable of discharging in a drop fire absent the upgraded internal parts offered by Canik as part of the voluntary upgrade program. Combined with Powell's evidence comparing the components of the pre- and post-Severe Duty Upgrade pistols, as well as his opinion that

28

the upgrade pistols no longer contained the defect that allowed the subject pistol's trigger to pull rearward, the Court finds that sufficient evidence exists to create a genuine issue of material fact regarding whether the subject pistol contained a defective condition. Accordingly, summary judgment will be **DENIED** on this ground.

### 4.    Defect Existed When Left Defendants' Control

Defendants contend, albeit summarily, that Powell did not test the design of the pistol in its condition as it was when it left defendants' control, as he tested the modified exemplar that is not equivalent to the subject pistol at the time it left their control [Doc. 65-1, p. 9]. Plaintiff does not respond to this argument.

As the Court noted *supra*, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court . . . to put flesh on its bones." *McPherson*, 125 F.3d at 995–96 (internal quotation marks and alterations omitted). Further, as noted previously, whether the alleged defect existed at the time it left defendants' control is the second element of a prima facie claim under the TPLA. *Merrell*, 680 F. Supp. 3d at 915.

Nonetheless, rather than address this element in a separate section, defendants seem to lump this argument together with its arguments regarding the existence of a defective condition. Defendants simply state, in the middle of a paragraph discussing whether Powell's testing uncovered a design defect, that "[i]t cannot be disputed that this modified exemplar is not equivalent to the subject pistol when it left Century's control"

29

[Doc. 65-1, p. 9]. The only other reference to this issue in defendant's memorandum in support of summary judgment is a citation to Tennessee Code Annotated §§ 29-28-105(a) and 29-28-108, setting forth the requirement that a product be defective or unreasonably dangerous at the time it left the control of the manufacturer or seller for liability to attach [*Id.* at 7 and n.2].

Given this cursory reference to the element, the Court finds that defendants have waived any argument for summary judgment on the basis of this element. Accordingly, to the extent that defendants seek summary judgment on this element, their motion is **DENIED**.

### 5. Causation

As to the third prong of a TPLA prima facie claim, defendants assert that plaintiff cannot establish causation of his injury [Doc. 65-1, p. 11]. Defendants argue that plaintiff did not witness the pistol fall, strike the ground, or discharge, and all other accounts of the event, including from plaintiff's experts, are based on plaintiff's speculative account of what occurred [*Id.* at 12].

Plaintiff responds that there is substantial evidence that the injury was caused by the pistol drop-firing due to the defective trigger safety, citing his testimony, the testimony of officers who responded to the scene, and Powell's opinion testimony [Doc. 75, pp. 18–19].

Defendants reply that plaintiff testified that he has no specific knowledge of what occurred and did not witness what happened, thus, his claim of a "drop fire" is unfounded

30

speculation [Doc. 81, pp. 2–3]. Moreover, his claim is "patently contradicted" by the evidence, as Powell was unable to recreate a drop discharge [*Id.* at 3]. Defendants also contend that police descriptions of the event fundamentally rely on plaintiff's claim of what occurred [*Id.* at 4]. Furthermore, defendants contend that the physical evidence of the broken sight is insufficient to defeat summary judgment, as there is no evidence to indicate the sight was broken as a result of the drop fire or rule out other possible causes of the broken sight [*Id.* at 7–9].

"Causation is an essential element of [a TPLA] claim, whether establishing that the product was defective or unreasonably dangerous." *Durham v. Johnson & Johnson*, No. 3:20-cv-554, 2021 WL 3745730, at *4 (E.D. Tenn. Aug. 24, 2021) (quoting *Tatham*, 473 S.W.3d at 749). "It is not enough that plaintiff suffered injuries from using . . . a product" but "[r]ather, there must be a showing that the particular defect or dangerous condition proximately caused the plaintiff's injury, or the manufacturer cannot be liable." *Id.* (internal quotation marks, citations and alterations omitted).

Moreover, in other contexts, Tennessee courts have held that "[t]estimony which amounts to mere speculation is not evidence which establishes proximate cause." *Primm v. Wickes Lumber Co.*, 845 S.W.2d 768, 771 (Tenn. Ct. App. 1992) (addressing the admissibility of an expert's medical testimony under Rule 702). "[T]he rule requiring causation be proven by a preponderance of the evidence dictates that Plaintiffs demonstrate that the negligence *more likely than not* caused the injury." *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598–99 (Tenn. 1993) (emphasis in original). "[P]roof of

31

causation equating to a 'possibility,' a 'might have,' 'may have,' 'could have,' is not sufficient, as a matter of law, to establish the required nexus between the plaintiff's injury and the defendant's tortious conduct by a preponderance of the evidence in a medical malpractice case. Causation in fact is a matter of probability, not possibility . . . ." *Id.* at 602.

"Where the evidence supports more than one reasonable conclusion, causation in fact and proximate causation are issues of fact which should be decided by the jury[.]" *Coffman v. Armstrong Int'l, Inc.*, No. E2017-01985-COA-R3-CV, 2019 WL 3287067, at *21 (Tenn. Ct. App. July 22, 2019) (quoting *Wilson v. Americare Sys., Inc.*, 397 S.W.3d 552, 559 (Tenn. 2013)). "However, 'the nonmoving party must do something more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Rye*, 477 S.W.3d at 265 (internal quotation marks omitted)).

As evidence of causation, plaintiff points to the following: (1) his own deposition testimony that the pistol "fired when he dropped it"; (2) the testimony of three police officers that the evidence at the scene was "consistent with a drop fire"; and Powell's testimony that the fractured sight on the pistol "could only have occurred due to the force of both the pistol hitting the concrete in a drop <u>and</u> with its firing" [Doc. 75, pp. 18–19 (emphasis in original)].[3]

---

[3] Plaintiff also pointed to testimony of Michael Whitley, a biomedical engineering expert [Doc. 75, p. 19], but Whitley's testimony has been excluded under Rule 702 and *Daubert* [Doc. 102]. Accordingly, the Court may not consider that testimony at this stage.

32

Specifically, regarding his own testimony, plaintiff cites to the following pages and line numbers from his deposition transcript: 54:17 to 55:7, 60:4 to 60:6 and 76:12 to 76:17 [*Id.* at 18]. Those sections state as follows:

> Q. So tell me, how do you –first off, how do you get the rear door open?
> A. It's a pull-up-type latch on the door and I can open it with one finger with my right hand.
> Q. So you're using the hand that has the Yeti to open the back of the car?
> A. Yes.
> Q. All right. So then once you open the car, what do you do next?
> A. I put my backpack in.
> Q. How do you do that?
> A. Most time, I just turn my body and set it down in the seat.
> Q. Did you do it any differently on February 25, 2019?
> A. No.

[Doc. 75-3, p. 15 (Exhibit C, Plaintiff's Deposition, 54:17 to 55:7)].

> Q. So when was the first moment that you knew that something happened and you were injured?
> A. My leg was on fire.

[Doc. 75-3, p. 16 (Exhibit C, Plaintiff's Deposition, 60:4 to 60:6)].

> Q. Did you make any effort to catch the firearm once it left your hand?
> A. No.
> Q. Did you know it was leaving your hand or did you not know it was leaving your hand?
> A. No, I did not.

[Doc. 75-3, p. 20 (Exhibit C, Plaintiff's Deposition, 76:12 to 76:17)].

But none of this cited testimony could establish causation. Specifically, none of the cited portions of plaintiff's deposition testimony indicates that he was injured by the subject pistol firing *after* hitting the ground. Instead, plaintiff's testimony merely establishes that he lost control of the subject pistol while loading other items into his

33

vehicle, and the pistol fired, injuring him.  But plaintiff has no information as to how the pistol fired, that is, whether it fired upon striking the concrete, or whether it fired upon contact between the pistol's trigger and some other object.  Indeed, in his deposition, plaintiff testified that he had no recollection of how he lost control of the pistol, he did not recall seeing the pistol leave his hand, and he was not aware that the pistol was leaving his hand [Doc. 65-4, pp. 59–60, 77; Doc. 75-3, p. 16].  And, most crucially, plaintiff specifically testified that he *did not know what caused the pistol to fire* and did not see when the pistol discharged [Doc. 65-4, pp. 60–61, Doc. 75-3, p. 16].  Given this testimony, plaintiff's assertion that he was injured by his pistol firing when he dropped it cannot create a genuine issue of material fact as to whether the pistol fired and injured him *as a result of* a manufacturing or design defect that allowed the pistol to fire when dropped on the concrete.

Next, plaintiff cites the following portions of Deputy Bowen, Deputy Brewer, and Detective Bowen's deposition testimonies:

> Q: Sure. So after you got to the scene and you talked to the deputies that were already there, what did you do at that point?
> Can you kind of take me through your steps of what you did?
> A. I just took the statements that was given verbally prior to his departure to the hospital from Mr. Hill to the officers on scene.
> And then looked, you know, at the place where the gun was at, so forth, to see if there was any difference between the story that was given and the scene of the evidence, if it disputed or contradicted anything, which it did not.

[Doc. 75-10, pp. 5–6 (Exhibit J, Christopher Bowen's Deposition, 20:18 to 21:5)].

> Q. Based on what you saw at the scene, did you conclude that this was an unintentional shooting?

34

A. Yes.
Mr. Erdreich: Objection to form.
By Mr. Garmon:
Q. And do you have any opinion – well, is it your opinion that the firearm
discharged after it was dropped to the ground?
Mr. Erdreich: Objection to form.
The Witness: Yes.

[Doc. 75-11, p. 6 (Exhibit K, Deposition of Craig Brewer, 21:10 to 21:19)].

Q. Was this an intentional shooting?
Mr. Erdreich: Objection to form.
The Witness: From my knowledge, no.

[Doc. 75-12, p. 3 (Exhibit L, Jerramie Bowen's Deposition, 9:18 to 9:20)].

Without further context, perhaps these selected portions of the responding
officers' testimony could establish a genuine issue of material fact as to causation. But
the Court cannot view these selected quotations in a vacuum. And, in the full context of
their deposition testimony, the Court finds that none of these officers' testimonies creates
a genuine issue of material fact as to causation.

First, although Deputy Bowen testified that nothing at the scene of the incident
contradicted what plaintiff told the responding officers, which was that the pistol fired
when dropped [Doc. 75-10, pp. 5–6], he also testified that he did not attempt to recreate
the incident, did not try to determine what caused the gun to fire, and did not investigate
if the gun had dropped or if it fired when dropped [Doc. 65-9, p. 8; Doc. 75-10, p. 9].
Deputy Bowen also testified that the purpose of his investigation was not to confirm
whether or not there was a drop fire [Doc. 65-9, p. 12; Doc. 75-10, p. 10].

35

Next, although Deputy Brewer agreed that it was his opinion that the pistol fired after it was dropped to the ground [Doc. 75-11, p. 6], he also acknowledged that this opinion was drawn "[f]rom the statements that [he] got from the victim on the scene" [*Id.* at 2, 5]. He did not do any independent investigation into the incident, including to confirm whether the firearm had fallen to the ground and discharged [Doc. 65-10, pp. 8, 11; Doc. 75-11, p. 10]. Deputy Brewer stated that, other than plaintiff's statement, he had no information to confirm that the gun did fall and fire [Doc. 75-11, p. 11].

Finally, Detective Bowen's testimony that the incident did not appear to be an intentional shooting [Doc. 75-12, p. 3] provides no evidence that could establish that the cause of the incident was a manufacturing or design defect of the firearm that permitted it to discharge upon striking the ground, versus any other cause of an accidental shooting. But, even if it did provide any evidence regarding causation, Detective Bowen also testified that he did not do anything to confirm plaintiff's story about what occurred other than recovering the firearm from the rear driver's tire area of the vehicle [*Id.* at 7]. He did not investigate to confirm whether it was a dropped firearm incident or some other type of firearm discharge [*Id.* at 9].

In sum, the full context of each of the responding officers' testimonies indicates that their opinions regarding the cause of the incident were drawn solely from plaintiff's statements to them at the time, and they conducted no further investigation into whether the pistol fired upon striking the ground, or whether there was some other accidental cause of the shooting. Moreover, to the extent that these officers' opinions are based

36

solely on plaintiff's statements to them at the time of the incident such is inadmissible hearsay, which the Court cannot consider at the summary judgment stage. *See Networks USA X, Inc. v. Nationwide Mutual Ins. Co.*, 748 F. Supp. 2d 836, 846–47 (E.D. Tenn. 2010) ("'[H]earsay evidence may not be considered on a motion for summary judgment.'" (quoting *Hartsel v. Keys*, 87 F. 3d 795, 799 (6th Cir. 1996))). Ultimately, these officers' testimonies, which are based solely on plaintiff's statements at the time of the incident, are insufficient to create a genuine issue of material fact for purposes of summary judgment, particularly considering plaintiff's testimony, discussed above, that he was unsure as to what caused the pistol to fire.[4]

Finally, plaintiff points to Powell's expert report and deposition testimony regarding the fractured rear sight on the subject pistol. Specifically, plaintiff cites to Powell's statement "[t]he subject pistol was submitted with a fractured rear sight" [Doc. 75-6, p. 1 (Exhibit F, Paragraph 5.1)]. Plaintiff also cites to the portions of Powell's report that contains photographs of a fractured sight on subject pistol, and states that "[t]he rear sight appears to be the impact point of the pistol from its drop discharge" and that the photographs show "severe impact and scraping marks on the sight fragment" [Doc. 75-6, pp. 18–19 (Exhibit F)]. Further, plaintiff cites a portion of Powell's deposition testimony, in which he states:

A. I did not. The rear sight fracture is a bending overload fracture through a resulfurized material. It's a single instance overload meaning it wasn't – it

---

[4] Although the Court finds that plaintiff and the officer's testimonies are insufficient, standing alone, to establish a genuine issue of material fact as to causation, nothing in this opinion should be interpreted as precluding the introduction of such testimony at trial.

didn't occur through several different applications of force, but a single application of force.

When I dropped my exemplar pistol onto a concrete impact from 60 inches and it landed on the rear side, it did no damage, so in order to break that side you're going to require the pistol to discharge and create a recoil to provide enough force to break off the rear sight.

[Doc. 75-7, p. 35 (Exhibit G, Charles Powell Deposition, 136:8 to 136:19)].

This quotation from Powell's deposition testimony appears to indicate that the evidence of the broken rear sight on the subject pistol shows that the pistol fired *after* hitting the ground, which would tend to support plaintiff's theory of a drop fire.

The Court has reviewed the further context of this statement in Powell's deposition testimony. His testimony continues as follows:

Q. Well, that's an assumption because you could break the rear sight in a different manner, right?
Mr. Wheeles: Object to the form.
A. Other than whatever manner that involves the facts in this case that would have broken off the rear sight. I mean, you can't hit it with a hammer without making other marks and showing that it occurred not from a drop impact, but from a hammer blow, for example.
Q. I'm pretty sure you could probably hit it with a hammer if you wanted to and break it. My question was how strong is the rear sight material? Did you do a hardness test?
A. I did not. We did not cut any sections from the rear sight.
Q. Did you perform metallurgical analysis on it?
A. I did not. I didn't think that it was necessary.
Q. Did you put it in an SEM?
A. No.
Q. So how much force is created by the, by a pistol discharging when it's held against an object?
A. Significant amount.
Q. Yeah, I want a – I'd like a number since you're a scientist. I want a number.
A. I haven't calculated a number.
Q. And you never measured a number; right?
A. That's correct, not in this case.

38

Q. And you never took a calculation or measurement of the number, compared it to the strength of the rear sight to figure out if it, it was even possible as alleged; true?

A. I've not, I've not done a calculation. *I have simply made an observation concerning the damage created from a fall without a recoil and the amount of damage and fracture that occurred to the subject pistol sight.*

Q. Well, you didn't do anything scientific to, to say how or why the sight would be broken. You're guessing. You're guessing about why you think the sight is broken?

Mr. Wheeles: Objection to form.

A. No, I'm not.

[Doc. 75-7, pp. 35–36 (emphasis added)].

Defendants contend that the evidence of the broken sight is too speculative, as it could have been broken a number of other ways [Doc. 81, pp. 7–8]. But Powell specifically testified that "in order to break that side you're going to require the pistol to discharge and create a recoil to provide enough force to break off the rear sight" [Doc. 75-7, p. 35]. Accordingly, this testimony, combined with the evidence of the broken sight, viewed in the light most favorable to plaintiff, would appear to support his theory of a drop-fire incident.

Defendants argue that the Court should discount Powell's testimony, labelling Powell's opinion as "speculative" and "conclusory," arguing that he did not meaningfully evaluate the broken sight [Doc. 81, p. 8]. But the Court cannot weigh the evidence at summary judgment. *See Moran v. Al Basit, LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (noting that, at the summary judgment stage "credibility judgments and weighing of the evidence are prohibited" (quoting *Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010))). Moreover, defendants' arguments in this regard harken back to the parties' *Daubert*

39

dispute regarding Powell's opinion evidence. And the Court denied defendants' *Daubert* motion, holding that the reliability of disputed evidence was a proper matter for cross examination and the jury's determination, rather than exclusion of evidence under *Daubert* [Docs. 101, 140]. The Court declines to revisit that holding in the context of this summary judgment motion.

Accordingly, viewing the evidence in the light most favorable to plaintiff, the Court finds that the evidence regarding the broken sight on the subject pistol, and Powell's testimony regarding the cause of the broken sight, create a genuine issue of material fact as to causation in this case. Defendants' motion for summary judgment on this ground is therefore **DENIED**.

## C. Punitive Damages

Defendants argue that, under Tennessee Code Annotated § 29-39-104(c), their status as a seller precludes punitive damages [Doc. 65-1, p. 16]. Additionally, defendants argue that their compliance with Massachusetts State Standards precludes punitive damages under the TPLA, specifically, Tennessee Code Annotated § 29-28-104 [*Id.* at 15–16]. Plaintiff contests whether punitive damages are precluded under either statute [Doc. 75, pp. 19–22].

In light of the Court's ruling that all of plaintiff's claims, with the exception of his failure-to-warn claim, will proceed to trial, and in the interests of judicial economy, the Court finds it most appropriate to **DEFER** ruling on defendants' arguments regarding punitive damages until trial.

40

## IV.     Conclusion

For the reasons set forth above, defendants' motion for summary judgment [Doc. 65] is **GRANTED in part, DEFERRED in part, and DENIED in part**. Specifically, defendants' motion is **GRANTED** as to plaintiff's claim for failure to warn, and that claim is **DISMISSED**.    The Court will **DEFER** a ruling on the matter of punitive damages until trial.  Defendants' motion is **DENIED** in all other respects.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE